## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

**WILLIAM DEAN, individually, on behalf of himself and all others similarly situated,**

        **Plaintiff,**

v.

**CITY OF MONTICELLO, MINNESOTA,**

        **Defendant.**

Civ. No. _____

**CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**

**(Jury Trial Demanded)**

Plaintiff, by his attorneys, Schiff Hardin, LLP and Oppenheimer Wolff & Donnelly LLP, on behalf of himself and on behalf of all other similarly situated persons, for his Class Action Complaint against Defendant, states and alleges as follows:

## I.    INTRODUCTION

1.    This is a civil class action brought by the Plaintiff and all others similarly situated (collectively, "the Class") against the City of Monticello, Minnesota ("the City" or "Defendant"). This action arises from the fraudulent offering and sale on June 19, 2008 (the "Sale Date") of $26,445,000 in face value of Telecommunications Revenue Bonds (FiberNet Monticello Project) Series 2008 (the "Bonds") issued by the City. The Bonds were issued by the City to provide funds to finance the development, acquisition, construction and installation of a "fiber to the premises" broadband communications network (the "FTTP Project"), which provides cable television services, internet access

and telephone services. The FTTP Project is owned, developed and constructed by the City.

2.     The City, in connection with the offering and sale of these Bonds, failed to disclose material facts that indicated that the FTTP Project could not generate sufficient net revenues to make the project economically feasible. Plaintiff and the Class purchased the Bonds upon review, and in reliance upon: a Preliminary Official Statement issued by the City on May 5, 2008 (the "Original POS"), and by a Supplement to the POS, dated June 3, 2008 (the "Supplement" and, together with the Original POS, the "Final POS"). As required by the rules of the Municipal Securities Rulemaking Board (the "MSRB") and Rule 15c2-12 of the Securities and Exchange Commission ("Rule 15c2-12"), the "Final POS" was the "deemed final" offering document. As also required by Rule 15c2-12, the Final POS, with additional information added, became the Official Statement dated June 10, 2008 (the "Official Statement," and, together with the Final POS, the "Offering Documents"), which failed to disclose material facts.

3.     The sole source of revenue to pay debt service on the Bonds is net operating revenues from the FTTP Project, after payment of certain operation and maintenance costs ("Net Revenues," or better stated, profit). The Bonds are not a general obligation of the City, and the City is not required to advance any money derived from any source other than Net Revenues from the FTTP Project for payment due under the Indenture. The City is also not obligated to raise any tax to make payments on the Bonds. The Net Revenues generated by the FTTP Project for the first several years of operations were highly dependent upon the time frame in which the network was

completed, as the underlying technology and direct competition in the retail telecommunications market is constantly evolving.

4.     In 2006, the City hired CCG Consulting, LLC ("CCG") to conduct a detailed Broadband Feasibility Study ("Feasibility Study") regarding potential construction of the FTTP Project.  As part of this Feasibility Study, CCG created a series of financial reports, including forecasted financial statements for the FTTP Project.  An updated version of these forecasted financial statements was included as Appendix F to the Original POS (the "Forecast").  The projected operating results for the FTTP Project shown in the Forecast were based upon the assumptions that revenues would begin to stream in to the FTTP Project in fiscal year 2008, that the FTTP Project would generate total operating revenues of over $1.1 million in fiscal year 2009, and further that the FTTP Project would achieve a 60% "penetration" of households in the City, in order to pay all of the operating expenses of the FTTP Project and to have enough surplus Net Revenues to pay the debt service on the Bonds each six months when due.  The Forecast further assumed that the FTTP Project would generate sufficient Net Revenues to begin paying debt service on the Bonds by fiscal year 2011.

5.     On May 21, 2008, less than one month before the issuance of the Bonds, a Summons and Complaint (the "Litigation") was served upon the City by Bridgewater Telephone Company, Inc. ("Bridgewater").   Bridgewater sought a preliminary and permanent injunction, barring the City from issuing the Bonds for the FTTP Project. The City was aware that, as a result of this ongoing Litigation, construction for the FTTP Project would be significantly delayed, and the projected Net Revenues set forth in the

POS were no longer accurate. However, the City fraudulently omitted from the Offering Documents any explanation that the pendency of the Litigation would cause such delay in construction for the FTTP Project, and further omitted any information regarding how that delay would affect projected Net Revenues, the sole source of cash flow to pay debt service on the Bonds.

6.    The City directly participated in fraudulently omitting the material information from, and making misleading statements in, the Offering Documents. Furthermore, the City was aware that the Bonds were to be sold primarily to "retail" purchasers, who were unsophisticated investors, to whom it owed a greater duty of care, particularly since the repayment of the Bonds was dependent upon the FTTP Project earning profits.

7.    After issuing the Bonds on June 19, 2008, the City escrowed the proceeds of the Bonds until the Litigation concluded eleven months later. The FTTP Project did not begin construction until the summer of 2009, and the project was not substantially complete until the end of 2010. Due to delays in construction as a result of the Litigation, as well as competition in the market, the FTTP Project has struggled to gain subscribers, failing to reach the "penetration rates" shown by the Forecast as needed to produce enough Net Revenues to pay debt service on the Bonds. In fact, the City has lost money every year providing the services contemplated by the FTTP Project, over $4,000,000 in the aggregate through the date hereof. Furthermore, until July of 2011, debt service on the bonds was paid solely from Bond proceeds and not from Net Revenues of the FTTP Project. The City then used a loan from another department to pay debt service on the

Bonds from June 2011 until June 2012.  The City has not paid debt service on the Bonds since July, 2012 and has publicly stated that it would not do so ever in the future.  The FTTP Project is currently, and projected to forever be, incapable of earning sufficient Net Revenues, or profit, to pay debt service on the Bonds.

## II.   **JURISDICTION AND VENUE**

8.     This Court has federal question jurisdiction pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

9.     Venue of this action lies in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and the property that is the subject of this action is located in this District.

## III.   **THE PARTIES**

### A. **Plaintiff**

10.     Plaintiff William Dean is a resident of Bloomington, Minnesota.  Dean is a semi-retired consultant who purchased $30,000 in Bonds in the original offering and another $20,000 within a month after the original offering.

11.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons who or which purchased the Bonds following their  issuance on the Sale Date, or who purchased the Bonds from such holders or transferees, whether or not they own Bonds at the time of the Settlement (the "Class Period").  Excluded from the Class are the Defendant, any entity in which the Defendant

has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors and predecessors in interest or assigns of any such excluded party.

12.     Because the Bonds were sold directly or indirectly to over 500 bondholders in numerous states, members of the Class are so numerous that joinder of all members is impracticable.  While the exact numbers of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number over at least 500 and that they are geographically dispersed.

13.     Plaintiff's claims are typical of the claims of the members of the Class, because Plaintiff and all of the Class members sustained damages arising out of Defendant's wrongful conduct complained of herein and Plaintiff and the Class were induced to purchase the Bonds as a result of Defendant's failure to disclose material facts in the Offering Documents.

14.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced and competent in class action and securities litigation.  Plaintiff has no interests that are contrary to or in conflict with the members of the Class who Plaintiff seeks to represent.

15.     A class action is superior to all other viable methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

16.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendant has acted on grounds generally applicable to the entire Class.   Among the questions of law and fact common to the Class are:

      a.   did Defendant knowingly, recklessly or with an intention to defraud, have knowledge of the dissemination of Offering Documents and their failure to disclose material facts?

      b.   did Defendant in connection with the purchase or sale of the Bonds engage in any act, practice or course of business which operated or would operate as a fraud or deceit upon the buyers of the Bonds?

      c.   were the projected Net Revenues contained in the Offering Documents an important factor in the decision of individual Bondholders to purchase the Bonds?

      d.   did the Offering Documents misrepresent material facts about the Net Revenues supporting the Bonds?

      e.   were Bondholders damaged by the Defendant's failure to disclose material facts in the Offering Documents?

**B.  Defendant**

17.     Defendant City of Monticello (the "City") is a political subdivision of the State of Minnesota.   The City is the issuer of the Bonds and the owner of the FTTP Project.   As the issuer of the Bonds, the City offered the Bonds to the investing public, including Plaintiff and the Class, during the initial public distribution.   The City failed to disclose numerous material facts in the Offering Documents.

## IV.   FACTUAL BACKGROUND

### A.   The City Begins Its Investigation into the FTTP Project

18.    According to the Official Statement, the City began its investigation into building a broadband communications network within the City in May 2005, as a means of stimulating the local economy. As part of this investigation, the City established a task force (the "Task Force") in order to further investigate the FTTP Project, with the specific stipulation that the FTTP Project would not be funded by a tax levy.

### B.   The City Retains an Independent Consultant to Prepare a Feasibility Study

19.    In December 2005, the Task Force issued a Request for Proposal ("RFP") for a broadband feasibility study, with responses due in February 2006. The Task Force ultimately hired CCG, Dain International Services ("Dain International") and Springsted Incorporated ("Springsted") to conduct the Feasibility Study. The final results of the Feasibility Study were published on September 18, 2006. The Feasibility Study included a market survey, development of a business model, and an analysis of operating models, competition, regulatory hurdles, legal issues, financial feasibility and financing alternatives.

20.    The results of the market survey indicated that residents would be willing to purchase cable television, high-speed internet and telephone services from the City, but *only if* the City could provide a lower cost-alternative to the current providers. The market survey of 374 residents found that 74% of residences would buy cable television from the City if they could save 15%, while another 21% said that they may buy cable television from the City. The survey also found that 67% of residences would buy

internet access from the City if offered at a discounted rate from the current cost, while another 24% said that they may buy from the City.  Finally, 60% of residences surveyed indicated that they would purchase landline telephone service from the City for a $5.00 discount in their current rate, while an additional 33% said they may switch.

21.     CCG also created a series of financial reports for the FTTP Project, including forecasted financial statements and projected market penetration rates for both residential and business customers, all of which were contained in the Forecast.  CCG assumed a cable television penetration rate of 60% of residential households by 2012, a telephone service penetration rate of 60% of residential households by 2012, and a high-speed internet and data service penetration rate of 35% of residential households by 2016.  CCG also assumed a cable television penetration rate of 17% of commercial customers by 2016, a telephone service penetration rate of 60% of commercial customers by 2013, and a high-speed internet and data service penetration rate of 34% of commercial customers by 2016.

22.     The Forecast concluded that the FTTP Project appeared economically feasible, assuming that the FTTP Project achieved the penetration rates set forth above.  The conclusions of the Forecast were based upon several factors, including (i) the market survey results indicating a demand for the services provided by the FTTP Project, and (ii) CCG's conclusion that the FTTP Project should be profitable enough to pay for operating costs, debt service, and capital improvements and replacements out of the revenues generated.  CCG's financial analysis of the FTTP Project, as updated and set forth in the Final POS, projected that revenues would begin to stream in to the FTTP Project in fiscal

year 2008, that the FTTP Project would generate total operating revenues of over $1.1 million in fiscal year 2009, and that the FTTP Project would generate sufficient Net Revenues to begin paying debt service on the Bonds by fiscal year 2011.

23.   The projected operating results and debt service coverage for the FTTP Project were drafted by CCG prior to the Litigation, and were never revised after the Litigation was filed in May 2008.  Even before the Bonds were issued, the City was aware that it would not be possible for revenue to begin streaming into the FTTP Project in fiscal year 2008, given the delay in construction that would occur as a result of the Litigation.  In fact, as could be expected, the Litigation took 11 months to conclude, and construction did not even begin on the FTTP Project until 2009.

**C.    The City Decides to Move Forward with the FTTP Project**

24.   After receiving the results of the Feasibility Study, the City Council approved moving forward with the FTTP Project at a City Council meeting held on September 25, 2006.

25.   The City then asked CCG to conduct a second market survey in November 2006, which consisted of CCG calling over 2,700 homes within the City.  Respondents were asked whether they would consider purchasing telephone, Internet and cable television services from the City.  CCG received 1,375 responses, and over 63% of those respondents indicated that they would purchase these services from the City, *if* the City could provide those services at a lower price than was currently being offered by its competitors.

26.     In early 2007, the City hired CCG, along with U-reka Broadband ("U-reka"), to perform an in-depth engineering study in order to estimate the cost of constructing the FTTP Project.   The results of this study are summarized in a Pre-Engineering Report, dated March 31, 2007.   The City represented in the Offering Documents that it would cost approximately $16.9 million to construct the FTTP Project.

27.     The Task Force was dissolved in May 2007, and a City Fiber Optics Committee (the "Fiber Optics Committee") was formed in its place.   The Fiber Optics Committee was tasked with identifying the components needed to construct, own and operate the FTTP Project.

28.     On September 18, 2007, the City conducted a City-wide referendum, seeking approval from City residents to construct a voice switch that would provide telephone service for the FTTP Project.   The referendum specifically asked, "Shall the City be authorized to construct, purchase, or proceed to acquire a telephone exchange?" The City-wide referendum received a positive response from 74% of voters.

29.     After the City-wide referendum passed, the Fiber Optics Committee developed a financial plan and business model for the FTTP Project.   The Fiber Optics Committee also hired Spectrum Engineering Corporation ("Spectrum") for design and inspection services, approved a management services contract for operation of the business, and developed a marketing plan.

30.     The City hired Hiawatha Broadband Communications, Inc. ("HBC") to manage the FTTP Project.   HBC is a Minnesota corporation that operates a number of broadband systems in Minnesota and Wisconsin.   The City and HBC executed a three

year management agreement, providing for HBC to operate the fiber-network on a day-to-day basis. Upon completion of the FTTP Project, HBC was to provide operations support, including technical support, a customer help desk, billing and general management support.

31. Finally, a governance ordinance establishing a telecommunication public service enterprise known as "FiberNet Monticello," was approved by the City Council on April 14, 2008.

**D.    The City Issues a Preliminary Official Statement for the Bond Offering**

32. On May 5, 2008, the City issued a Preliminary Official Statement ("Original POS") in connection with the upcoming Bond offering. The Original POS set forth, among other things, the terms of the proposed Bond issuance, a description of bondholder risks, background information regarding the FTTP Project, results of the Feasibility Study, details regarding the construction of the FTTP Project and forecasted financial statements for the FTTP Project.

**i.    Terms of the Bond Issuance**

33. The Bonds were to be delivered pursuant to an Indenture of Trust (the "Indenture"), dated June 1, 2008, between the City and Wells Fargo Bank, N.A. as trustee (the "Trustee"). Individual purchases of these Bonds were to be made in denominations of $5,000 or any integral multiple thereof, and were to be in book-entry form only.

34. The proceeds of the Bonds were intended to be used for (i) the cost of acquiring, installing, developing and constructing the FTTP Project, (ii) to pay capitalized interest on the Bonds during the construction of the FTTP Project, (iii) funding of the

2008 Reserve Requirement for the Bonds, (iv) to pay start-up costs of the FTTP Project, and (v) to pay costs for the issuance of the Bonds.  The Bonds were to be tax-exempt (i.e., interest on the Bonds would not be subject to Federal income taxation) and were to bear interest at 6.5% with respect to the Bonds maturing in 2023, and 6.75% with respect to the Bonds maturing in 2031.  Interest was to be and is payable semi-annually, on June 1 and December 1 of each year, beginning December 1, 2008.

35.     The Bonds were to be and are subject to optional redemption before the stated maturity date at the option of the City, in whole or in part, on any date on or after June 1, 2018, at a redemption price equal to 100% of principal plus accrued interest.  In the event that the FTTP Project is damaged or destroyed, the City may call for the redemption of the Bonds then outstanding if the damage exceeds $1 million.  The Bonds are also subject to a mandatory sinking fund redemption each June 1, according to the schedule listed in Appendix 2, solely from net revenues of the FTTP Project, at a redemption price equal to 100% of principal plus accrued interest.

36.     Debt service on the Bonds was to be paid solely from Net Revenues from the FTTP Project, after payment of certain operation and maintenance costs.  The City was and is not required to advance any money derived from any source other than Net Revenues from the FTTP Project for payment due under the Indenture.  The economic feasibility of a fiber-net communications network that uses net revenues to service the debt incurred by building the network is highly dependent upon the time frame in which the network was completed, as the underlying technology and direct competition in the retail telecommunications market is constantly evolving.

### ii.      Construction of the FTTP Project

37.      The FTTP Project would provide cable television, high speed internet access and telephone service within the City.  The majority of cable television programming was to have been received from signals off satellites from content providers through negotiated agreements.  The City's internet service was to have consisted of speeds of anywhere from 10 to 100 Mbps, with an increase to 200 Mbps at nominal cost. Telephone services were to have been provided using the City's own voice switch.

38.      The City estimated that the "backbone network" for the FTTP Project would be completed by the end of 2008, with the aim to service every customer in the City who desires service within 24 months of the date of the Bond issuance.  The estimated cost of construction for the FTTP Project was $16.9 million.  The fiber network portion of the FTTP Project was expected to begin construction in June 2008 and was to be completed by the spring of 2009.  Construction of the FTTP Project was to be fully completed within 30 months of the Bond issuance.

39.      The FTTP Project would have to directly compete with two incumbent providers: (i) TDS Telecommunications Corp. ("TDS"), a telephone company headquartered in Wisconsin; and (ii) Charter Communications, Inc. ("Charter"), a local cable television provider.  Both TDS and Charter also offer internet services.  At this time, the City had not yet developed final products and prices for the FTTP Project, but estimated that it would be able to offer "enhanced services" at an approximately 15% discount from the competition.

### iii.    Forecasted Financial Statements for the FTTP Project

40.    The projected operating results, or Forecast, for the first eight fiscal years of the FTTP Project are set forth in Appendix F to the Final POS, entitled "Forecasted Financial Statements." These financial statements were prepared by CCG on or around April 24, 2008.

41.    The Forecast was based upon the same customer penetration rates set forth in CCG's Feasibility Study. CCG assumed a cable television penetration rate of 60% of residential households by 2012, a telephone service penetration rate of 60% of residential households by 2012, and a high-speed internet and data service penetration rate of 35% of residential households by 2016. CCG also assumed a cable television penetration rate of 17% of commercial customers by 2016, a telephone service penetration rate of 60% of commercial customers by 2013, and a high-speed internet and data service penetration rate of 34% of commercial customers by 2016. The forecasted financial statements are also based upon the assumption that the FTTP Project will be able to offer pricing for voice, cable television, and high-speed internet services at approximately 15 percent below the TDS and Charter prices as of March 2008.

42.    According to the forecasted financial statements, revenues would begin to stream in to the FTTP Project in fiscal year 2008, the FTTP Project would generate total operating revenues of over $1.1 million in fiscal year 2009, and the FTTP Project would generate sufficient Net Revenues to begin paying debt service on the Bonds by fiscal year 2011.

E.      **The Litigation is Filed Against the City**

43.      On May 21, 2008, shortly before the Bonds were to be issued, the City was served with a Summons and Complaint in the Litigation brought by Bridgewater.   The case was captioned *Bridgewater Telephone Company, Inc., a Minnesota corporation, Plaintiff, vs. City of Monticello, Minnesota, Defendant*, in the State of Minnesota District Court, Wright County, Tenth Judicial District.   In the Complaint, Bridgewater, whom the City believes to be an affiliate of TDS, sought a preliminary and permanent injunction barring the City from issuing the Bonds for the FTTP Project, a declaration that any Bonds issued by the City were void, and further relief as the Court deemed just.

44.      In its Complaint, Bridgewater alleged that the creation and operation of the FTTP Project was not a permitted use for revenue bonds issued under Minnesota Statutes, Section 475.52, Subdivision 1.   Bridgewater further alleged that this statute prohibited the issuance of revenue bonds for the corporate purpose of paying current expenses, and that the funding of the Operating Reserve Fund with Bond proceeds constituted an unpermitted use of Bond proceeds for current expense payments.

F.      **The Supplement and the Official Statement Failed to Disclose Material Facts Related to the Litigation**

45.      Shortly after the Litigation was filed against the City, the City issued the Supplement to the Original POS, dated June 3, 2008.   The information contained in the Supplement was later incorporated into the Official Statement.   These Offering Documents were misleading and failed to disclose material facts which would have cast doubt on the forecasted financial statements for the FTTP Project.

46. The Supplement, which is only eight pages in total, provided the bondholders with a brief, two-paragraph description and assessment of the Litigation. According to the Supplement, the City believed that the Litigation was "without merit," but also noted that "an evaluation of the probability of a favorable outcome is speculative. The "LITIGATION" section of the Supplement provides only the following brief disclosure regarding delays in construction of the FTTP Project: "[S]hould an injunction be granted or the Bonds be declared void there would be a material adverse effect on the ability of the City to construct the FTTP Project and place it in service, with a corresponding material adverse effect on the City's ability to pay debt service on the Bonds."

47. The statements contained in the Supplement regarding the Litigation were misleading, as they give potential bondholders the impression that the FTTP Project would only be adversely impacted by the Litigation if the City were to lose the case on the merits. The City failed to disclose that the pending Litigation would cause an inevitable delay in the proposed construction schedule for the FTTP Project, thus rendering the Forecast set forth in the POS inaccurate.

48. The Supplement amended the section of the Original POS titled "Construction of the FTTP Project." However, the only additional information added to this section was the following italicized phrase: "*Aside from delays in construction as a result of the Litigation described under 'LITIGATION' herein*, the City expects to complete the backbone network by the end of 2008 and expects to be able to serve every customer that desires service within 24 months."

49.     The Supplement also removed from the "Construction of the FTTP Project" section of the Original POS any statement that provided a definitive timeline for the construction of the FTTP Project.  For example, the following phrases were removed from Page 22 of the Original POS:

> "Construction of the fiber network portion of the FTTP Project is expected to begin in June 2008 and is planned to be completed by the spring 2009."

> "It is anticipated that some conduit at residences and businesses will be installed during the construction process to allow installation of test customers at the end of 2008, and general customers during the first quarter of 2009."

However, no additional information was provided to bondholders regarding what type of delays could be expected as a result of the Litigation, or how these delays would alter the construction timeline for the FTTP Project set forth in the Original POS, and therefore materially affect the Forecast.

50.     The Statements contained in the Supplement regarding "Construction of the FTTP Project" were misleading.  Defendant purposely removed from the Offering Documents all statements that provided a definitive timeline for construction of the FTTP Project, and failed to provide an updated timeline to the bondholders.   Defendant was aware that Net Revenues for the FTTP Project were highly dependent upon the time frame in which the network was completed, as the underlying technology and direct competition in the retail telecommunications market is constantly evolving.  In spite of this, Defendant fraudulently omitted from the Supplement any information regarding how

the pending Litigation against the City would affect the construction schedule for the FTTP Project or the forecasted financial statements for the FTTP Project.

51.    In the Supplement, Defendant failed to update *any* of the financial data contained in Appendix F of the Original POS, which contains the Forecast for the FTTP Project.  This Forecast was the sole source of information regarding the Net Revenues that would be generated by the FTTP Project.  Instead, Defendant merely added the following disclosure to the section of the POS entitled "Projected Operating Results and Debt Service Coverage":

> "The financial forecast represents the City's best estimate, as of its date, prior to the filing of the litigation described under the heading "LITIGATION" herein and any construction delays resulting therefrom, of projected financial results based upon its judgment of the most probable occurrence of certain important future events."

52.    Defendant also added the following disclosure to the section of the Original POS entitled "Bondholders' Risks – Forecasted Financial Statements":

> "The forecasted financial statements prepared by the City and CCG Consulting LLC, Beltsville, Maryland, are based upon the assumptions made by the City prior to the commencement of the litigation described under the heading 'LITIGATION' herein…The City does not intend to issue additional forecasts and accordingly there are risks inherent in using the financial forecast in the future *as it becomes outdated*." (emphasis added)

53.    The statements contained in the Supplement regarding the Forecast for the FTTP Project are misleading.  Defendant failed to disclose to bondholders that, as a result of the pending Litigation, the Forecast provided in the Original POS was *already* outdated at the time the Supplement was issued.  Defendant was aware that the Litigation

would cause a significant delay in construction of the FTTP Project; and as a result, the projected Net Revenues set forth in the Forecast were no longer accurate. However, Defendant fraudulently omitted from the Supplement any information regarding how a delay in construction of the FTTP Project would affect projected Net Revenues, the sole source of revenue to pay debt service on the Bonds.

### iii.    The Official Statement

54.    On June 10, 2008, and as required by Rule 15c2-12, the City issued the Official Statement in connection with the Bond Offering. This Official Statement incorporated all revisions to the Final POS that were set forth in the Supplement. The Official Statement did not provide any additional detail regarding the Litigation, above and beyond what was contained in the "LITIGAION" section of the Supplement.

55.    Just as it had done in the Supplement, Defendant failed to make even a single update to the Forecast for the FTTP Project in the Official Statement. Instead, Defendant included the same version of "Appendix F" that was included with the Original POS, which had been prepared by CCG *prior* to the commencement of the Litigation. Defendant fraudulently omitted from the Official Statement any information regarding how a delay in construction of the FTTP Project would affect projected Net Revenues, the sole source of revenue to pay debt service on the Bonds.

56.    Defendant also failed to disclose to potential bondholders in the Official Statement that the City had no experience in the retail telecommunications market. The City had never before provided cable television, internet or telephone services to its residents. Since Net Revenue from the FTTP Project was highly dependent on the City's

ability to run a successful retail telecommunications business, this information should have been provided to the Plaintiff and the Class as part of the description of key risks associated with this investment.

57.     The Official Statement provides for both optional and mandatory redemption of the Bonds as a result of the Litigation.     The Bonds were subject to optional redemption by the City, in whole but not in part, on or prior to one year after the date of issuance of the Bonds, in the event that the Litigation had not been dismissed or otherwise resolved.   The Bonds were also subject to mandatory redemption, in whole but not in part, upon the occurrence of a Mandatory Redemption Event, which includes "the earlier to occur of (a) June 19, 2009, if a Litigation Dismissal has not occurred prior to such date, or (b) the occurrence of an Adverse Litigation Event." Despite its opportunity to do so, knowing that while the Litigation was pending, Broadridge was developing its own fiber network in in City limits in order to compete head-on with the FTTP Project and being made aware of other changes in the marketplace, the City never chose to exercise the optional redemption of the Bonds.   Rather, the Litigation concluded in May 2009, a month prior to the mandatory redemption date for the Bonds, and the City proceeded to complete construction of the FTTP Project.

## G.     Defendant Knowingly or Recklessly Made the Misleading Statements in the Offering Documents

58.     Defendant knew that any facts that would indicate to a potential Bond purchaser that the FTTP Project was not economically feasible would be material and must be disclosed in the Offering Documents.

59.     Defendant knew that the Offering Documents were intended to create and did create the impression that the FTTP Project could reasonably be expected to attract a sufficient number of customers, in order to generate the Net Revenues projected in the Offering Documents.

60.     Defendant knew that the ability of the FTTP Project to attract customers and generate the Net Revenues needed to make debt service payments on the Bonds as they became due was largely dependent upon the time frame in which the network was completed.

61.     As a result, Defendant knew that any facts that would indicate to a potential Bond purchaser that construction of the FTTP Project would be significantly delayed would be material facts that must be disclosed in the Offering Documents.

62.     As the issuer of the Bonds, Defendant made the alleged representations contained in Appendix F of the Official Statement that revenues would begin to stream in to the FTTP Project in fiscal year 2008, that the FTTP Project would generate total operating revenues of over $1.1 million in fiscal year 2009, and that the FTTP Project would generate sufficient Net Revenues to begin paying debt service on the Bonds by fiscal year 2011. Defendant had actual knowledge that construction of the FTTP Project would be delayed as a result of the pending Litigation, and that, as a result, the representations made in the Forecast regarding projected revenues for the FTTP Project were outdated and inaccurate.

**H.     Defendant Acted With Deliberate Recklessness**

63.     As the issuer of the Bonds, Defendant made all the representations in the Offering Documents and owed a duty to bond purchasers to take reasonable steps to ensure that the Official Statements contained full and fair disclosure of all material facts and did not make any false or misleading statements of material fact.

64.     Defendant knew that, as a result of the pending Litigation against the City, construction of the FTTP Project would be delayed, and that projected Net Revenues for this project had materially changed as a result.  Defendant also knew that bondholders could not rely on the Forecast set forth in the Official Statement to determine when the FTTP Project would begin to generate Net Revenues.

65.     As the issuer of the Bonds, Defendant made the above alleged representations contained in the Forecast set forth in the Official Statement regarding the projected Net Revenues of the FTTP Project, and the other financial information contained therein.  Defendant had actual knowledge that the above alleged statements in the Official Statement were misleading due to the failure to disclose all material facts.

**I.     The Bonds Were Issued in June 2008 and Were Purchased by Plaintiff and the Class in Reliance Upon the Misleading Offering Documents**

66.     The Original POS was dated May 5, 2008 and was provided to potential Bond purchasers.  The Supplement was dated June 3, 2008, and the Final POS was provided to potential Bond purchasers.  The Official Statement was dated June 10, 2008 and was provided to potential Bond purchasers.

67.     Plaintiff and the Class purchased the Bonds in reasonable reliance upon the Offering Documents that were prepared and issued on behalf of the City in the months following May 2008.  Plaintiff and the Class would not have purchased the Bonds if they were not reasonably assured that the FTTP project could attain the projected Net Revenues set forth in the Forecast, and in the time frames assumed therein.

**J.      After the Bonds are Issued, the FTTP Project Experiences Construction Delays and Is Unable to Generate Net Revenues**

68.     After issuing the Bonds on June 19, 2008, the City escrowed the proceeds of the Bonds until the Litigation concluded eleven months later.  The FTTP Project did not begin construction until the summer of 2009, and the project was not substantially complete until the end of 2010.

69.     Due to delays in construction as a result of the Litigation, as well as competition in the market, the FTTP Project has struggled to gain subscribers.  In fact, the City has lost money providing the services contemplated by the FTTP Project.  Furthermore, until July of 2011, debt service on the bonds was paid solely from Bond proceeds and not from Net Revenues of the FTTP Project.  The City also used a loan from another department to pay debt service on the Bonds from June 2011 until June 2012.

**i.      The City Hires an Independent Contractor to Conduct a Restructuring Assessment of the FTTP Project**

70.     In 2012, the City hired GigaBit Squared ("GigaBit") to conduct a restructuring assessment of the FTTP Project.   On September 31, 2012, GigaBit published its FiberNet Restructuring Assessment (the "Gigabit Report").

71.     The GigaBit Report acknowledges that, "[D]ue to the lawsuit, pricing pressure from Charter, and the upgrades from TDS, [the FTTP Project] was not able to generate sufficient revenue to cover its costs and debt service in the timeframe predicted." The GigaBit report also found that the FTTP Project "has not yet turned EBITDA positive meaning that it has not generated the surplus funds necessary to cover the Bond payment." The Gigabit Report noted that as a result, the City had been forced to borrow between $3 and $4 million from liquor store reserves in order to pay debt service on the Bonds.

72.     According to the GigaBit Report, the FTTP Project had not achieved the projected market penetration rates for 2012 that were set forth in the Offering Documents.   As of 2012, the FTTP Project had only achieved a cable television penetration rate of 29% of residential households, and a telephone service penetration rate of 22% of residential households.  In its Feasibility Study, CCG had assumed that the FTTP Project would have achieved a 60% penetration rate in both of these markets by 2012, which is more than double the actual penetration rates that were achieved. Consequently, the FTTP Project could not and cannot in the future generate sufficient cash to cover operating expenses and debt service on the Bonds.

**ii.     The City Issues a Notice of Status to the Bond Trustee**

73.     On June 6, 2012, the City issued a Notice of Status of FiberNet Monticello Project ("Notice of Status") to Wells Fargo Bank, N.A., as Trustee for the Bond offering. In the Notice of Status, the City states that, although the FTTP Project is substantially

complete, "net revenues of the system are not sufficient to pay both operation costs and debt service payments on the Bonds."

74.     Although the FTTP Project had not yet generated sufficient Net Revenues to make deposits to the debt service fund, the City had nevertheless made supplemental payments to the fund from July 1, 2011 to May 1, 2012.  The City had used a loan from another department to pay debt service on the Bonds during that time frame.  However, in the Notice of Status, the City notified Wells Fargo that it planned to stop making supplemental payments to the debt service fund as of June 1, 2012.  The City stated that, "There is a debt service reserve fund that is available to make debt service payments for the near future in the event that net revenues of the System are insufficient to fund debt service payments."

75.     The FTTP Project is currently and in the future incapable of earning sufficient Net Revenues to pay debt service on the Bonds.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Violation of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder)**

76.     Plaintiff and the Class repeat and reallege the allegations of all preceding paragraphs of the Complaint and incorporate the same by reference.

77.     Defendant, directly and indirectly, in connection with the offering and sale of the Bonds to Plaintiff and the Class, recklessly, knowingly and/or with intention to defraud, made untrue statements of material fact or omitted to state material facts, which

material facts were necessary in order to make the statements not misleading in light of the circumstances under which those statements were made, in violation of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

78.     The Offering Documents and the appendices thereto were the principal selling documents for the Bonds and were specifically intended and designed for the benefit and guidance of prospective investors, such as Plaintiff and the Class. Defendant knew that investors would rely upon the information contained in the Offering Documents when deciding whether or not to purchase the Bonds.

79.     Plaintiff and the Class, either directly or acting through their authorized brokers, reasonably relied upon the Offering Documents.

80.     The purpose, effect and result of the violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 by the Defendant was to induce Plaintiff and the Class to purchase the Bonds, something they otherwise would not have done.

81.     As a direct and proximate result of the above-alleged violations of Section 10(b) of the Securities Act of 1934 and SEC Rule 10b-5 promulgated thereunder, Plaintiff and the Class have suffered damages in connection with their respective purchases of the Bonds during the Class Period.

## SECOND CLAIM FOR RELIEF

**(Violation of Minnesota Securities Act of 2002, § 80A.68 Section 501)**

82.     Plaintiff and the Class repeat and reallege the allegations of all preceding paragraphs of the Complaint and incorporate the same by reference.

83.     The Minnesota Securities Act of 2002 provides that it is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly, (i) to employ a device, scheme, or artifice to defraud; (ii) to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make a statement made, in the light of the circumstances under which it is made, not misleading; or (iii) to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

84.     Defendant, directly and indirectly, in connection with the offering and sale of the Bonds to Plaintiff and the Class, recklessly, knowingly and/or with intention to defraud, made untrue statements of material fact or omitted to state material facts, which material facts were necessary in order to make the statements not misleading in light of the circumstances under which those statements were made, in violation of the Minnesota Securities Act of 2002 [M.S.A. § 80A.68, Section 501].

85.     The Offering Documents and the appendices thereto were the principal selling documents for the Bonds and were specifically intended and designed for the benefit and guidance of prospective investors, such as Plaintiff and the Class.  Defendant knew that investors would rely upon the information contained in the Offering Documents when deciding whether or not to purchase the Bonds.

86.     Plaintiff and the Class, either directly or acting through their authorized brokers, reasonably relied upon the Offering Documents.

87.     The purpose, effect and result of the violations of the Minnesota Securities Act of 2002 by the Defendant was to induce Plaintiff and the Class to purchase the Bonds, something they otherwise would not have done.

88.     As a direct and proximate result of the above-alleged violations of the Minnesota Securities Act of 2002, Plaintiff and the Class have suffered damages in connection with their respective purchases of the Bonds during the Class Period.

## THIRD CLAIM FOR RELIEF

### (Common Law Fraud)

89.     Plaintiff and the Class repeat and reallege the allegations of all preceding paragraphs of the Complaint and incorporate the same by reference.

90.     Defendant made material misrepresentations of fact, and material omissions of fact, as set forth above, in connection with the offerings and sales of the Bonds to Plaintiff and the Class.

91.     The misrepresentations and omissions, as set forth above, were made with the intent to induce Plaintiff and the Class to purchase the Bonds.

92.     Plaintiff and the Class were not aware of the omissions and did not know that the representations were false.

93.     Plaintiff and the Class justifiably relied upon the representations contained in the Offering Documents and, as a direct and proximate result, have suffered damages.

## RELIEF REQUESTED

Plaintiff and the Class request that the Court enter judgment in their favor, and against the Defendant, on each of their Claims for Relief and award Plaintiff and the Class:

a.  Statutory damages or rescission;

b.  In the alternative, out-of-pocket damages;

c.  Prejudgment interest;

d.  Costs;

e.  Attorneys' fees as allowed by law; and

f.  Any other relief which the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class hereby demand a jury trial with respect to their Complaint.

Dated:  February 12, 2014

By: */s/ David B. Potter*

David B. Potter (#121642)
Archana Nath (#387662)
OPPENHEIMER WOLFF &
DONNELLY LLP
Campbell Mithun Tower
Suite 2000
222 S. Ninth Street
Minneapolis, MN 55402
Telephone: (612) 607-7000
Facsimile: (612) 607-7100
dpotter@oppenheimer.com
anath@oppenheimer.com

Geoffrey H. Coll
SCHIFF HARDIN LLP
901 K Street NW
Suite 700
Washington, DC 20001
Telephone: (202) 778-6432
Facsimile: (202) 778-6460

Rick L. Frimmer
SCHIFF HARDIN LLP
233 South Wacker Drive
Suite 6600
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600

Attorneys for Plaintiff